# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 14-cr-00161-REB(s)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.     GEOFFREY H. LUNN,

        Defendant.

---

## PLEA AGREEMENT AND STATEMENT OF FACTS RELEVANT TO SENTENCING

---

The United States of America (the government), by and through Kenneth M. Harmon, Assistant United States Attorney for the District of Colorado, and the defendant, Geoffrey H. Lunn, personally and by counsel, Scott T. Varholak, Assistant Federal Public Defender, and Edward R. Harris, Assistant Federal Public Defender, submit the following Plea Agreement and Statement of Facts Relevant to Sentencing pursuant to D.C.COLO.LCrR 11.1.

### I.  PLEA AGREEMENT

A.     The defendant agrees to plead guilty to Count 8 of the Second Superseding Indictment, charging him with wire fraud, in violation of Title 18, United States Code, Section 1343, and Count 41 of the Second Superseding Indictment, charging him with engaging in monetary transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

B.     The defendant further agrees that, although he is not entering guilty pleas to all of the counts alleged as predicate offenses for the forfeiture allegations set forth in the Second



Superseding Indictment, he will consent to forfeiture of his interest in all property that may constitute or is derived from proceeds of his commission of or involvement or participation in all such charged offenses (not just the offenses of conviction), as well as the underlying scheme with which he is charged in the Second Superseding Indictment, including, but not limited to, (a) a money judgment not exceeding approximately $5,124,795, the total amount currently believed to have been raised from investors and investor groups pursuant to the scheme charged in the Second Superseding Indictment minus the returns of principal investment amounts to them; (b) the particular assets identified in paragraphs 26a and 26b of the Second Superseding Indictment; (c) approximately $20,000 in funds deposited into three offshore bank accounts held in the names of Matrix Holdings Gmbh, Concord Latin America, and Prime Western Group AG, which accounts have been identified in pretrial discovery in this case; and (d) property which may be deemed substitute assets up to the value of forfeitable property, as described in paragraph 27 of the Second Superseding Indictment.

C.1.   The parties agree that restitution is mandatory in this case.   The defendant agrees that, although he is entering a guilty plea only to one count of wire fraud, restitution due and owing from him should be calculated and based on all of the losses associated with the entirety of his conduct and the charged fraudulent scheme, and is not limited to losses associated solely with respect to any particular victim connected to the wire transaction identified in Count 8 of the Second Superseding Indictment. The defendant agrees, moreover, that he should be subject to an order of restitution, in particular, for all losses of principal of all those investors who lost money as a result of the charged fraudulent scheme and its related conduct.   The parties currently estimate that such losses to investors collectively total approximately $5,124,795.   The specific victims entitled to restitution and the particular amounts owed to them in restitution shall be determined by

the Court at sentencing.

C.2.    Additionally, the defendant agrees to pay restitution to Geraldine Kowalcyk, his mother-in-law, in relation to losses sustained by her in connection with the unauthorized use of her bank account to make reimbursement payments to certain investors or investor groups that invested in the scheme charged in the pending indictment, which losses are currently believed to be approximately $81,000.

D.1.    The defendant agrees to cooperate fully with the Office of the United States Attorney for the District of Colorado, and the Federal Bureau of Investigation, and law enforcement and regulatory authorities designated by them (collectively, the "Law Enforcement Agencies"), in the investigation and prosecution of persons known or suspected to have committed offenses.   Such cooperation shall not be limited to persons identified as targets or subjects of the investigation that led to the indictments in this case and includes, but shall not necessarily be limited, to (a) providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by the Law Enforcement Agencies, whether in interviews, through affidavits or declarations, before a grand jury, at a deposition conducted pursuant to Fed.R.Crim.P. 15 or at any trial or other court proceeding; (b) appearing at such grand jury proceedings, hearings, depositions, trials, and other judicial proceedings, and at meetings, as may be required by the Law Enforcement Agencies; (c) submitting to debriefings and interviews for preparing for testimony and court appearances; and (d) permitting law enforcement personnel to inspect the contents of and messages stored in email accounts used by the defendant in communications that were involved in the matters under investigation.

D.2.    The defendant further agrees to cooperate fully with the Law Enforcement Agencies in the identification, recovery and repatriation of assets that are subject to, or are

3

otherwise available for, forfeiture pursuant to his plea obligations with respect to forfeiture, as set forth in paragraph B above.  Such cooperation shall include, but not necessarily be limited to, (a) submitting to debriefings concerning the identification, recovery and repatriation of potentially forfeitable assets; (b) producing documents, records and other evidence, as requested by the Law Enforcement Agencies, relevant to these subjects; (c) executing documents required by financial institutions and custodians who may have custody or control of potentially forfeitable assets in order to permit access to records concerning such assets and in order to facilitate the recovery and repatriation of such assets; (d) providing truthful testimony concerning these subjects, whether in the form of testimony or through affidavit or declaration; and (e) appearing at judicial or administrative hearings and proceedings as may be necessary for these purposes.

E.     The Office of the United States Attorney for the District of Colorado agrees that – contingent upon the defendant's entry of a guilty plea and sentencing on Counts 8 and 41 of the Second Superseding Indictment and the defendant's fulfillment of his other plea obligations -- it will move to dismiss with respect to him, with prejudice, the remaining counts of the Second Superseding Indictment, the Superseding Indictment and the Indictment, following sentencing. The Office of the United States Attorney for the District of Colorado further agrees that – contingent upon the defendant's entry of a guilty plea and sentencing on Counts 8 and 41 of the Second Superseding Indictment and the defendant's fulfillment of his other plea obligations -- it will not further prosecute the defendant for the conduct set forth in the pending indictments in this case or any other criminal conduct known to the Office of the United States Attorney for the District of Colorado as of the date of this plea agreement, which conduct concerns the defendant's activities relating to and arising out of the scheme set forth in the pending indictments and his misuse of a bank account held on behalf of Geraldine Kowalcyk in order to make payments to

investors and/or investor groups that invested in the scheme.

F.1.     The parties acknowledge that, pursuant to *United States v. Booker*, 543 U.S. 220

(2005), the Court, while not bound by them, is required to consider the United States Sentencing

Guidelines and determine the defendant's applicable sentencing guideline range, in deciding the

sentence in this case.

F.2.     The parties agree to take the respective positions ascribed to them regarding the

sentencing factors set forth in Part VI herein (the parties' Advisory Guideline Computation and

3553 Advisement), which positions could result in an advisory sentencing guideline range as high

as 108 to 135 months (the cumulative result of all possible government guideline positions) and as

low as 70 to 87 months (the cumulative result of all possible defense guideline positions),

assuming that the defendant's criminal history places him in Criminal History Category I.[1]

F.3.     The government agrees to evaluate the nature and extent of the defendant's

cooperation and assistance in the investigation and prosecution of others and to make that

cooperation and assistance known to the Court at the time of sentencing.   In discharging this

obligation, the government reserves the right to advise the Court of all facts pertinent to the

sentencing process, including all relevant information concerning the defendant's background and

offense conduct and conduct while on pretrial release awaiting sentencing in this case.

F.4.     If, in its judgment and the exercise of its discretion, the government determines at

the time of sentencing that the defendant has provided substantial assistance in the investigation

and prosecution of persons who have committed criminal offenses, the government, in connection

---

[1]     The parties recognize that the Sentencing Commission has promulgated amendments to the fraud guideline, effective November 1, 2015.  Notwithstanding Paragraph F.2, the parties may alter their position on the guideline calculations set forth in Part VI if the alteration is based upon a guideline amendment and would not violate the Ex Post Facto Clause of the United States Constitution.

with the Court's duty to consider the Sentencing Guidelines, agrees to move the Court, pursuant to U.S.S.G. § 5K1.1, to impose a sentence which would be a departure below the applicable sentencing guideline range, *contingent, however, on the defendant's continuing full, complete and truthful cooperation in the performance of his plea obligations, his compliance with pretrial release conditions in this case and his not committing another criminal offense between the date of his plea agreement and his sentencing.* Should it so move, the government will determine its recommendation as to the nature and extent of a departure, at the time of sentencing based on the status of the defendant's assistance and cooperation at that time. The defendant agrees and acknowledges that a motion for a substantial assistance departure pursuant to § 5K1.1 is a matter committed to the sole discretion of the government.

F.5.    The defendant is free, at the time of sentencing, to make to the Court any arguments in support of any lawful sentence in this case, provided, however, that such arguments are consistent with the sentencing guideline positions ascribed to him under the plea agreement with respect to the calculation of his advisory sentencing guideline range, as set forth in Paragraph F.2 and Part VI herein, and are not factually inconsistent with his entry of guilty pleas and admissions of guilt with respect to Counts 8 and 41 of the Second Superseding Indictment or with the body of stipulated facts set forth in Part V herein (the parties' Stipulation of Facts).

G.    The parties agree that they will jointly move the Court to continue the defendant's sentencing in this case, until after his assistance in the prosecution of other persons, in particular through the provision of testimony in trial proceedings, has substantially been completed, so that the parties may be in a position fully to apprise the Court of the nature, extent and significance of such assistance. The parties agree that the Court's rejection of any such joint request will not be grounds for the defendant to withdraw his guilty pleas in this case. The parties acknowledge that,

6

in the event of such a rejection, the government will have opportunity to afford the defendant sentencing consideration for his cooperation and assistance by way of post-sentencing motion pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.

H.       The defendant agrees that, as a condition of supervised release or probation, he will not act as a fiduciary or be employed in a fiduciary position and that he will not otherwise be engaged in employment or an occupation involving his solicitation of funds for investment or his custody or control of investor funds.   The defendant further agrees that, if he is not deported, any conditions of supervised release or probation should include the special conditions that (1) his employment be approved in advance by his supervising probation officer; (2) that he provide his supervising probation officer access to any financial records requested by such officer and otherwise be subject to financial monitoring by such officer; (3) that he shall not register any business entities without prior disclosure to his supervising probation officer; and (4) that he shall not conduct any financial transactions through accounts of any business entities or individuals not made known to and approved by his supervising probation officer.

I.       The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.   Understanding this and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following three criteria: (1) the sentence imposed is above the maximum penalty provided in the statute of conviction; (2) the Court, after determining the otherwise applicable sentencing guideline range, either departs or varies upwardly; or (3) the Court determines that the total offense level is greater than 27 and imposes a sentence based upon that higher offense level determination. The defendant also agrees to waive his right to challenge this prosecution, conviction, or sentence

7

and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255, except that such waiver provision will not prevent him from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that he was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct.   Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from these waiver provisions.

     J.     The parties agree and acknowledge that the government's obligations under this plea agreement are expressly contingent on the defendant's performance of his obligations under the plea agreement.   The parties further agree and acknowledge, in particular, that should the defendant breach this agreement by (1) failing to provide truthful testimony and information about his own conduct or the conduct of others who may have committed crimes; (2) refusing to cooperate in the investigation and prosecution of others, or in the identification, recovery and repatriation of potentially forfeitable assets; or (3) violating his conditions of pre-trial release, including, but not limited, among other ways, committing another criminal offense while on release in this case, the government is entitled, at its election, to be relieved of its obligations under this plea agreement and may elect to abrogate the agreement and prosecute the defendant to the full extent permitted under law.

     K.     The parties understand, acknowledge, and agree that the sentencing recommendations of the parties under this plea agreement are made pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure and are not binding on the Court.

## II.   THE ELEMENTS OF THE OFFENSE

The defendant understands that, in order to be convicted of the offense of wire fraud, in

violation of 18 U.S.C. § 1343, as charged in Count 8 of the Second Superseding Indictment, the

government, at trial, would have to prove the following essential elements beyond a reasonable

doubt:

1. The defendant devised or intended to devise a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses, representations or promises as described in the indictment;

2. The defendant acted with specific intent to defraud and to obtain money or property by means of false or fraudulent pretenses, representations or promises;

3. The defendant used interstate or foreign wire communications facilities for the purpose of carrying out the scheme; and

4. The scheme employed false or fraudulent pretenses, representations, or promises that were material.[2]

The defendant understands that, in order to be convicted of the offense of engaging in

monetary transactions in property derived from specified unlawful activity, in violation of 18

U.S.C. §1957, as charged in Count 41 of the Second Superseding Indictment, the government, at

trial, would have to prove the following essential elements beyond a reasonable doubt:

1. That the defendant knowingly engaged or attempted to engage in a monetary transaction;

2. That the defendant knew the transaction involved criminally derived property;

3. That the property had a value of greater than $10,000;

4. That the property was, in fact, derived from the specified unlawful activity described in the Second Superseding Indictment, that is, the wire fraud scheme set forth in Counts 1 through 26 of the Second Superseding Indictment; and

5. That the transaction occurred in the United States.[3]

---

[2]     Tenth Circuit Pattern Jury Instruction 2.57 (2011) (modified).

[3]     *United States v. Dazey*, 403 F.3d 1147, 1163 (10th Cir. 2005); 18 U.S.C. § 1957.

9

### III.  STATUTORY PENALTIES

The maximum statutory penalty for the offenses set in Count 8 of the Superseding Indictment is: not more than twenty (20) years imprisonment; not more than a $250,000 fine or alternatively a fine that is twice the amount of the criminally derived property involved in the charged transaction; or both imprisonment and a fine; not more than three (3) years supervised release; a $100 special assessment fee; plus restitution.

The maximum statutory penalty for the offenses set in Count 41 of the Second Superseding Indictment is: not more than ten (10) years imprisonment; not more than a $250,000 fine or alternatively a fine that is twice the amount of the criminally derived property involved in the charged transaction; or both imprisonment and a fine; not more than three (3) years supervised release; a $100 special assessment fee.

A violation of the conditions of probation or supervised release may result in a separate prison sentence and additional supervision.

### IV.  COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury. If the defendant is an alien, the conviction may cause the defendant to be deported or confined indefinitely if there is no country to which the defendant may be deported, to be denied admission to the United States in the future, and to be denied citizenship.

### V.  STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty pleas that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as

10

part of its sentencing methodology, compute the advisory guideline range for the offenses of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. §3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. §3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is in or about February 2010.

The parties agree that the government's evidence would establish the following:

**Background and Summary of the Fraudulent Scheme.**

A.      During the times material to this case, the defendant, a resident of Boulder County, Colorado, was a self-employed, erstwhile real estate broker who was attempting to develop and pursue a real estate investment and real estate financing business through WGC Group, Inc. ("WGC Group"), a Nevada corporation that he had formed for this purpose.

B.      Commencing in or about February 2010 and continuing through in or about March 2011, the defendant collaborated with and assisted an individual first introduced to him as "Robert Paluscek," and whom he knew by various names, to offer an array of purported high yield investment programs to the investing public through a purported entity called Dresdner Financial ("Dresdner") and, in relation to two particular investment programs offered through Dresdner, to

11

collect over $5.8 million in advance fees from investors in exchange for undertaking to secure for them commercial financing in the form of non-recourse loans backed by pledged financial instruments.   The true identity of this individual, who went by the name "Robert Perello" during and in relation to these investment offerings, was determined, through identifications made by the defendant and others, and through corroborating evidence gathered during the course of the investigation leading to this case, to be co-defendant Jaime Beebe.   The two investment programs through which the defendants raised the approximate $5.8 million in advance fees were primarily known as the "Bullet and Rocket Leveraged Financing Program" ("hereinafter, the "Bullet and Rocket Program") and the ".44 Magnum Leveraged Financing Program" (hereinafter, the ".44 Magnum Program").

C.     As he later recounted to federal criminal and securities investigators,[4] the defendant had engaged co-defendant Beebe a year or so earlier to help the defendant obtain financing for the defendant's real estate investment business.   Eventually, the defendant agreed to assist co-defendant Beebe with the investment offerings that co-defendant Beebe was formulating. The defendant agreed, among other things, to allow a bank account that he maintained for WGC Group to be used to collect and disburse investor funds taken in through the Dresdner investment programs.

D.     The defendant and co-defendant Beebe marketed Dresdner's investment programs through a website created and maintained by co-defendant Beebe, and through a network of sales

---

[4]     The U.S. Securities and Exchange Commission ("SEC") and the Federal Bureau of Investigation ("FBI") conducted parallel civil and criminal investigations leading to the commencement of this case.   During its investigation, the SEC took sworn testimony of the defendant in April 2011.   As part of the criminal investigation, FBI Special Agents twice interviewed the defendant prior to his indictment in this case. Some of the facts set forth in this section are drawn on statements and admissions made by the defendant to both civil and criminal investigators, a number of which are summarized in criminal complaint affidavits filed with respect to the defendant and co-defendant Beebe (see Docket Entry Numbers 1, 41).

affiliates who solicited investor funds in exchange for receiving commissions based on the amounts they brought into Dresdner.  In written materials prepared by co-defendant Beebe and posted on its website, and in oral representations made by both defendants and their sales affiliates, Dresdner was portrayed as a "leader in creative Commercial Financing, Bank Instruments, Bond Programs and more" and boasted of having an "extensive network of connections with the Top-50 banking institutions in the world." Supposedly headquartered in Chicago, Illinois, the purported financial services company claimed to sponsor and administer an assortment of investment programs offering the prospect of extraordinary, above-market returns over a short period of time, which programs centered around the acquisition, purported "monetization," and trading of a variety of bank instruments, such as bank guarantees, standby letters of credit and medium term notes. The investment programs, which included the Bullet and Rocket and .44 Magnum Programs, were primarily targeted at persons and organizations seeking financing for various types of commercial projects.

E.    Co-defendant Beebe, using the names "Robert Perello" or "Bobby Perello," held himself out as, and led others to believe he was, the founder of Dresdner and, variously, its purported president, one of its other senior officers or one of its senior consultants.   The defendant was portrayed as Dresdner's vice president and held himself out, at times, as being one of Dresdner's officers and, at times, as being one of its sales affiliates.  Playing off of its name, the defendant and certain of Dresdner's affiliates led various investors to believe that Dresdner Financial was affiliated with Dresdner Bank, a large and longstanding German bank that had recently been acquired, and that he and other Dresdner principals had connections to the German financial institution and had plans to acquire several banks to expand Dresdner's operations.   In actuality, however, Dresdner was a fictitious entity; it had no recognizable offices in Chicago,

13

Illinois or elsewhere, and the telephone number listed on its website for its corporate headquarters, in reality, was the number for a prepaid cellular telephone listed under a fictitious name. Nor did the defendant, co-defendant Beebe or any of the Dresdner affiliates have any connections to the former German bank or any other legitimate financial institution for that matter.

F.     As related in Dresdner's website and in its other written promotional materials, and as further explained by both defendants and their affiliate in follow up conversations, the Bullet and Rocket and .44 Magnum Programs promised investors extraordinary, above-market returns with no risk and on a short term basis. Investors were told that in exchange for an upfront payment by the investor, characterized as an "entry fee," Dresdner would lease or otherwise acquire one or more bank instruments on behalf of the investor, which Dresdner would, in turn, "nearly simultaneously" "monetize" by providing the instruments to a third party lender who would extend non-recourse loans on the instruments.   Investors were further told that they would be guaranteed a certain loan-to-value on these non-recourse loans, thereby guaranteeing them certain minimum returns, and that because the loans were non-recourse, the funds disbursed to investors would not have to be repaid by the investors themselves.  Instead, investors were told, the leased bank instruments, after serving as the vehicle for investor payouts, would then be placed by Dresdner on a bank trading platform and, through successive trades, used to generate the funds to repay the lessors of the bank instruments, as well as to pay Dresdner and its affiliates their fees and commissions on the transactions. In this manner, Dresdner and its affiliates would receive their payouts at the 'back end' of the transactions and investors' entry fees would serve only to lease the bank instruments.

G.     As both programs were explained, investors' actual returns would depend largely on the entry fee amounts that they were willing to pay; typically, the greater the entry fee, the

larger the promised return.   While the timing, entry fee amounts and promised returns were changed over time, most of the investors who were solicited for the .44 Magnum Program were promised at least a guaranteed $2 million return on a minimum entry fee of $44,000 (a return of in excess of 4,000%) and were typically promised that these returns would be delivered within 10 to 12 banking days but, in no event, beyond a month's time from receipt of the entry fee. Similar representations were made to investors solicited for the Bullet and Rocket investment programs; they were typically promised that the minimum entry fee of $10,000 would yield a $100,000 (or 1,000%) return within 10 days and that they could receive a 1,000% return within the same time span at other entry fee levels as well.   They were also told that they could realize up to 2,000% in returns on a minimum entry fee of $250,000 if they waited 30 days. And with some variations on the program, investors were even promised up to a 5,000% return on their money. Regardless of particular dollar amounts promised a particular investor at a particular point in time, both programs were represented in writing as being "100% guaranteed," both in terms of their success and the actual returns being promised.   In the case of the .44 Magnum Program, investors were also told that Dresdner would further insure the bank instruments through an "insurance wrap" obtained through an established insurance company such as Lloyd's of London.

H.      Investors, upon being drawn to the Bullet and Rocket and .44 Magnum investment programs through Dresdner's website and its affiliates solicitations, were typically directed to review sets of agreements, assurance letters, and written instructions that co-defendant Beebe had prepared in connection with the programs.   This investment program paperwork was made available to the investors either through the Dresdner website or through its affiliates.   As investors and their representatives engaged in their reviews, affiliates would often direct them to the defendant or co-defendant Beebe to review and answer questions about the investment

15

programs.   Either the defendant or co-defendant Beebe would then conduct telephone conferences with the affiliates and investors and representatives for this purpose and to review the investment program paperwork. In many of these conversations, and in preliminary solicitations, investors and their representatives were falsely assured that the defendant and co-defendant Beebe had had prior success with Dresdner's investment programs and that earlier Dresdner investors had seen their promised returns.

I.      Once this process was completed, investors and their representatives were directed to execute the investment program paperwork and return the completed documents to the defendant. The investors and their representatives were then directed to wire transfer their entry fees for the programs to a bank account that the defendant maintained in the name of WGC Group with JP Morgan Chase Bank, which account the defendant oversaw and exclusively controlled. They were told that their investment funds would thereafter be accepted for investment, and that they would be eligible to participate in the investment programs, once the investors had passed Dresdner's "compliance" review. In fact, however, no such review was undertaken; the funds were simply accepted for deposit by the defendant, and no review was undertaken of investors' qualifications either by the defendant, co-defendant Beebe or any of the Dresdner affiliates.

J.      In all, through these solicitations and representations, the defendant and co-defendant Beebe, took in approximately $5,845,768 from 72 investors or groups of investors located throughout the United States and abroad, over the course of February 2010 through February 2011, as purported entry fees for the Bullet and Rocket and .44 Magnum investment programs. Virtually all of this money was received into the defendant's WGC Group business bank account with JP Morgan Chase Bank.   The defendant provided investors and their representatives copies of their completed investment program paperwork and maintained a set of

16

these records on behalf of himself and co-defendant Beebe.[5]

      K.    Although the Bullet and Rocket and .44 Magnum investors were promised that their money would be returned to them within a short period of time, together with the promised returns, none of the investors received their money back within the time frames initially promised, nor did any receive the types of returns initially promised to them. None but a handful of investors received any money back at all. The defendant, through the Dresdner affiliates and, at times directly, continually advised investors that their payouts would take place on particular dates, only to then postpone the dates by five to seven days, or more, as the payout deadlines approached. When payout timelines were missed, various excuses were given to the investors as to the reason for the delay. Investors were reassured that they would receive their payout. The excuses, for the most part, came from the defendant and were relayed to the investors through the Dresdner affiliates. The excuses for the delay in the payouts included the following: (1) that the designated insurance company was behind schedule in providing the "insurance wraps" for the bank instruments; (2) that there were delays in moving necessary funds into or out of the United States; (3) that transactions involved in facilitating the programs' payouts were pending approval by the United States Federal Reserve or the United States Securities and Exchange Commission ("SEC"); (4) that there were other holds placed on Dresdner's funds by banks and governments; (5) that the Dresdner principals were working through tax reporting issues; (6) that "paymasters" and others responsible for transactions facilitating the programs' payouts were taking longer than

---

[5]    The defendant performed a similar role with respect to Dresdner's affiliates, reviewing and maintaining agreements and related documents that co-defendant Beebe prepared and required that persons execute in order to act as affiliates for Dresdner. The defendant often explained the investment programs to newly recruited affiliates and thereafter served as a point of contact for the affiliates in their dealings with co-defendant Beebe and in connection with the investment programs generally.

expected to complete their work; (7) that some of the delays were due to "bank holidays"; (8) that compliance reviews were still not completed; (9) that the transactions were being reviewed by Homeland Security; and (10)  (ultimately) that lawsuits that certain groups of investors were beginning to bring were holding up the process.   The origin of some of these excuses, according to the defendant, was co-defendant Beebe; other excuses, the defendant later admitted in investigative testimony before the SEC, he just made up in order to prolong the process. All of the various excuses, whatever their source, were, as the defendant knew, false and ungrounded in the truth. Neither the defendant, nor co-defendant Beebe, nor any of the Dresdner affiliates, or those on their behalf had undertaken to do or initiate the particular things which the defendant professed were the causes for the payout delays.

L.      As the defendant was aware, most, if not all, of the approximately $5.8 million in investor funds wire transferred into his WGC Group business account was not used for anything even remotely connected to securing the bank instruments promised under the Dresdner investment programs or to otherwise facilitate realizing the promised returns through the other aspects of the programs, such as obtaining "insurance wraps" and arranging for third parties to "monetize" the instruments.  Instead, the defendant disbursed most of the money for patently unrelated purposes, including for personal living expenses for himself and co-defendant Beebe. These unrelated disbursements included the following:

L.1.    Cash Deliveries to Co-Defendant Beebe.  Shortly after receiving the first investor deposits, at co-defendant Beebe's request and direction, the defendant started withdrawing and accumulating cash, primarily at various branches of JP Morgan Chase Bank in and about Boulder and Denver, Colorado, which he then arranged to transport to co-defendant Beebe in or about Albuquerque, New Mexico, Las Vegas, Nevada, and Los Angeles, California.   According to the

defendant, once he accumulated the cash requested by co-defendant Beebe, he would put the cash in a bag or envelope and either drive or fly to meet Beebe in these various locations. On two occasions, when meeting co-defendant Beebe in Las Vegas, the defendant, upon arrival in that city, made additional large cash withdrawals, at Beebe's request, which money he then provided to Beebe and Beebe would then use for gambling and entertainment with the defendant and others, and for expensive jewelry and clothing purchases, and the balance of which Beebe pocketed.   On other occasions, when meeting co-defendant Beebe, in Los Angeles, the defendant would stop off in Las Vegas, and withdraw additional large sums of cash for Beebe, which he would carry with him on the remainder of his trip to see Beebe. Once in Los Angeles, at Beebe's direction, the defendant would withdraw even more cash, which he then delivered to Beebe.   In all, between February, 2010 and October, 2010, the defendant made twelve separate trips to meet with co-defendant Beebe, providing Beebe a total of approximately $806,000 in cash.[6]   The defendant acknowledged to the SEC and FBI agents investigating this case that he knew virtually from the beginning of his collaboration with co-defendant Beebe on the Dresdner investment programs that Beebe had no intention of using the investor money as promised.[7]

---

[6]     The twelve trips are catalogued in the Second Superseding Indictment in this case, in a table setting forth Counts 27 through 37 (Docket Entry No. 67).   Certain of the larger cash withdrawals that made up some of the cash delivered to co-defendant Beebe on these trips are alleged as overt acts to Count 45 of this same indictment (Docket Entry No. 67, 2nd Superseding Indictment, Count 45, Overt Acts G through L).

[7]     In investigative testimony before the SEC, the defendant described Beebe as basically a "con man" and related to the SEC that Beebe confided in him at one point that Beebe had chosen to call Dresdner Financial's lead investment offering the ".44 Magnum" program" because "[w]hen people found out that they'd been ripped off, they would buy a .44 Magnum and shoot themselves in the head."   The defendant stated that he nevertheless continued to give Beebe investor funds, as requested, because he feared that the man would do harm to him and his family if he did not comply, an assertion he repeated when later interviewed by FBI agents.   During the investigation, FBI agents, in fact, recovered two voice messages that co-defendant Beebe had left for the defendant on or about March 28, 2011, in which Beebe threatened to burn down the defendant's house and kill him because the defendant had violated Beebe's instructions and was avoiding his calls. During the course of the criminal investigation, the defendant's spouse also related an incident in which she observed co-defendant Beebe threaten the defendant with physical violence.
(Continued on Next Page)

L.2.    <u>Western Union & MoneyGram Transfers for Co-Defendant Beebe</u>. Beginning in
late February 2010 and continuing through February 2011, the defendant also sent investor funds
to co-defendant Beebe, or at his direction and on his behalf, through Western Union and
MoneyGram money transfers.   The defendant typically made these transfers by making cash
withdrawals from various branches of JP Morgan Chase Bank in and around Boulder, Colorado
and providing the cash to clerks at nearby stores housing these money transfer businesses.   The
transfers would typically be in amounts ranging between $200 and $1,000 and would often be
made out in names of fictitious payees arranged between Beebe and the defendant in advance or in
the names of certain of Beebe's relatives.   Using pre-arranged codes, Beebe or a relative would
then typically pick up the wired cash at Western Union and MoneyGram locations in and about
Albuquerque, New Mexico and various locations in Southern California. In all, the defendant sent
approximately $139,341 in funds to or for Beebe through these money transfers.[8]

L.3.    <u>Setting Up and Funding Offshore Accounts</u>. Once investor funds started coming
into the defendant's WGC Group business bank account, the defendant, acting on co-defendant
Beebe's direction, formed several corporations and other entities domiciled outside of the United
States as part of a plan devised by co-defendant Beebe to remove and hold the Dresdner investor
funds outside of the United States.   The defendant set up at least four such foreign entities and set
up foreign bank accounts in the names of three of these entities.   The defendant expended
approximately $10,377 in investor funds to do so. The defendant then transferred approximately
$20,000 in investor funds to three of these bank accounts for Matrix Holdings Gmbh, Concord

---

[8]      Over the course of December 2010 and January 2011, the defendant also paid co-defendant Beebe
approximately an additional $10,481 out of funds that he had on hand which were not derived from Dresdner investor
deposits.

Latin America, and Prime Western Group AG, three of the entities.

L.4.   <u>Gifts to Professional Escorts</u>.   Approximately $1,005,318 in investor funds was traced to payments that the defendant made as gifts of money and merchandise for, and in connection with entertainment of, three women whom the defendant met in Las Vegas, Nevada in or about August or September 2010.   These women were interviewed as part of the criminal investigation and determined to be professional escorts operating out of Las Vegas.   In addition to cash payments to the escorts, the defendant made large wire transfers to bank accounts each held in their own names.   He also used investor funds to purchase expensive jewelry, clothing and other merchandise for them, as well as a 2011 Land Rover sports utility vehicle which the escorts kept in North Carolina where they resided at the time.[9] During the pre-indictment investigations, the defendant was questioned about these expenditures and acknowledged that these were not for investor-related purposes, but rather for the professional escorts, stating in substance that the payments were made to the women to help them get a better life.[10]

L.5.   <u>Investor Funds for Personal Expenses</u>.   Additionally, at least approximately $796,000 in investor funds was traced to personal expenditures that the defendant made on his behalf or to support his family. These expenditures included payments of the defendant's home mortgage, payments for vehicles that he and family members drove, payments to satisfy large pre-existing debts (mostly credit card bills), and payments of legal bills for matters pre-dating the

---

[9]     Certain of the payments to the professional escorts, large wire transfers to their bank accounts, are set forth as part of Counts 38 through 44 of the Second Superseding Indictment, alleging monetary transactions in criminally derived proceeds.   Count 41 and the forfeiture notice allegations of that indictment identify the vehicle purchase payment and the Range Rover vehicle.

[10]     The defendant also told FBI agents over the course of their interviews that, at some point, he decided to divert investor funds in this manner because he wanted to keep the investor money away from co-defendant Beebe out of fear for how Beebe would use the money.

defendant's involvement in the Dresdner investment programs.

M.     As delays in the promised investor payouts mounted, the defendant also used a portion of the investor funds that were coming into him, as part of an effort to conceal his and co-defendant Beebe's ongoing diversions and misappropriations of investor money and their lack of progress in using the investors' money to secure and "monetize" the bank instruments as promised and advertised under the Bullet and Rocket and .44 Magnum investment programs. Some of these expenditures were directed and planned by co-defendant Beebe or done with his knowledge and approval. Others were not.   All were designed to mollify Dresdner affiliates and investors, in the face of the protracted payout delays or done in an effort to convince the latter that the investment programs were starting to work.

M.1.    Payments of "Advances" on Dresdner Affiliate Commissions.   Beginning as early as in or about June 2010, the defendant and co-defendant Beebe began hearing from certain Dresdner affiliates about the delays in the promised investor payouts.   These affiliates complained, in particular, about how the delays prevented them from being paid their commissions on the investor funds that they had brought in on the Dresdner investment programs and how they were now in need of money.   In order to address these concerns, co-defendant Beebe told the defendant and the affiliates that he would start paying the affiliates advances on the commissions that the affiliates would earn and otherwise receive upon the investor payouts.   In order to help fund these commission advances, co-defendant Beebe advised the defendant and these affiliates that he would raise the entry fee amounts for the Bullet and Rocket and .44 Magnum investment programs. Beebe then prepared and circulated to the defendant and the Dresdner affiliates a schedule that described the new set of investor entry fees, the corresponding commission advances that affiliates could expect to receive from the entry fees, and the final expected payouts and

22

disbursements from those payouts. The defendant thereafter started making payments of purported advance commissions to the Dresdner affiliates, in accordance with this schedule (or revisions thereof), out of the investor entry fees that the affiliates caused to be sent to the defendants. As the investment scheme progressed, and as the amounts in investor funds misappropriated by the defendant and co-defendant Beebe accumulated, the defendant had to start applying some of the entry fees received on behalf of newer investors in order to fund advance commission payments on entry fees received on behalf of earlier investors. In all, the defendant made approximately $1,442,950 in purported advance commission payments to Dresdner affiliates.

M.2.  Ponzi Payments to Select Investors and Investor Groups.  Unbeknownst to co-defendant Beebe, the defendant also made payments to three sets of individual investors or investor groups of funds in excess of their principal investments when these investors started to express concerns about the delays in their promised payouts. The defendant told these investors that the payments were either partial payouts on the investment programs, which were starting to operate, or were advances on future expected payouts from the programs. The payouts were at least twice what the investors had paid in purported entry fees and in some cases well above this level.[11] At least one group of investors threatened to contact law enforcement agents if it did not see some immediate return on its investment. By early November 2010, the head of this group, which had invested approximately $250,000 in the .44 Magnum Program under the name Dunamis Diversified Industries, made his concerns known to the defendant and threatened action. Shortly thereafter, the defendant made two successive payments totaling $1 million to this investor

---

[11]     One investor (D.T.), for instance, paid an entry fee of approximately $9,973 and approximately three months later received a "return" of $50,000.

group's bank account.   Approximately eight days later, the investor group returned $120,000 to the defendant as a purported re-investment in the .44 Magnum Program.   In all, the defendant returned approximately $1,150,000 to these three sets of investors, paying the investors collectively more than $800,000 above their principal investments. The defendant funded these payments from recent entry fees that he was receiving from newer investors that affiliates were bringing into the Dresdner investment programs.

M.3.   Refund Payments to Select Investors.   The defendant also refunded certain investors and groups of investors their entry fees when they persisted in complaining about the protracted delays in the promised investors payouts.   The defendant made full refund payments to eight such investors or investor groups, totaling approximately $203,000. The refund payments were also made unbeknownst to co-defendant Beebe.

N.   In order to fund the foregoing payments and to continue to fund their collective misappropriations, the defendant and co-defendant Beebe both concealed from later Dresdner investors and from the affiliates soliciting these later-stage investors that the .44 Magnum and Bullet and Rocket programs were not functioning as advertised in their written promotions about the programs and that none of the earlier investors had actually received any funds based on returns from investments in these programs.   They concealed from these investors as well that virtually none of the earlier investors' funds had been used as promised under the investment programs but had been diverted and misappropriated instead.   When questioned, they stated that programs had been functioning, earlier investors had been paid some or all of the promised returns and that larger and final payouts anticipated under the programs were imminent.   By late December 2010, on co-defendant Beebe's instructions, the defendant and the Dresdner affiliates also began to promise investors even greater returns to compensate investors for the delays.   As

24

the promised payout deadlines approached, however, in order to deflect payout demands,

co-defendant Beebe devised a "roll out program", under which pre-existing Dresdner investors

were encouraged to "roll over" their expected returns into additional investments in the Dresdner

programs, on the prospect that doing so would further enhance investors' returns and allow them to

achieve their investment goals with more leverage.   Written materials showing how the "rollout

program" could achieve enhanced returns were prepared and circulated among the investors.

     O.     By late January and early February 2011, the defendant began confiding to certain

Dresdner affiliates that the Dresdner investor entry fees that he had received for the investment

programs had not been used as contemplated under the programs.   The defendant blamed

co-defendant Beebe for misusing the investor funds and for the lack of progress in obtaining and

"monetizing" and using the bank instruments promised under the programs.

     P.     By in or about late February 2011, the SEC began an investigation into the

Dresdner investment programs and began issuing subpoenas for records and testimony to the

defendant and certain of the Dresdner affiliates. The defendant began telling certain affiliates and

certain investors and representatives of investor groups, when they continued to complain about

the delays, that he was pursuing separate transactions involving the purchase and sale of foreign

bonds that offered the prospect of large returns.   The defendant explained that he was acting as a

broker on these transactions and that, because of the size of the transactions, he expected to receive

a large commission payment that he planned on applying to the Dresdner investment programs so

that the investors would realize their promised payouts.   He claimed that these bond transactions

would be imminently closing and that he stood to receive as much as $500 million in commissions

from them.   The defendant continued in his efforts to lull investors well after the SEC

investigation became overt, telling investors who would complain to him that their payouts were

imminent and awaiting upon the closing of overseas financial transactions.

**The Defendant's Post-Scheme Repayment Efforts.**[12]

Q.      Several investor groups commenced lawsuits against the defendant to recover their

investments. One group of investors, led by an individual identified herein as B.E., began

particularly aggressive efforts to recoup its $200,000 investment, after obtaining a default

judgment against the defendant, in connection with a suit.   In furtherance of collection efforts on

this judgment, B.E. contacted the defendant directly in order to secure repayment of his group's

funds.   In an effort to accommodate B.E., the defendant agreed to make a series of partial

payments to B.E. and his group. Commencing in or about February 2013 and continuing into

September 2013, the defendant sent B.E. two wire transfers and a series of checks in various

amounts totaling approximately $83,000.   The checks were drawn on two different bank

accounts.   Approximately $2,000 of these funds came from a family bank account that the

defendant maintained with his spouse and adult son. The remaining money, however, was funded

from a wire transfer and checks drawn on an account maintained for the benefit of the defendant's

elderly mother-in-law, Geraldine Kowalcyk. The defendant's spouse had established this account

to pay for her mother's living expense and was a signatory on the account but allowed the

defendant to administer to the account on her behalf.   In February 2013, at the beginning of his

series of payments to B.E., the defendant convinced his spouse to let him "borrow" some money

from her mother's account purportedly to pay taxes due that year for the couple.   The money was

used to pay B.E. instead.   Thereafter, the defendant obtained the balance of the money he used

---

[12]      For the purposes herein, the defendant neither admits nor denies the facts set forth in this section (*i.e.*,
Paragraphs Q and R). Both parties agree, however, that the calculation of the defendant's sentencing guidelines
remains unaffected whether or not the facts set forth in this section are within or outside of the scope of his relevant
offense conduct.

from his mother-in-law's account to fund payments to B.E. by forging his spouse's name on the checks.

R.     The $83,000 in payments did not satisfy B.E. and he demanded more and larger payments from the defendant during this period.   Beginning in April 2013 and continuing through September 2013, the defendant wrote and sent to B.E. a series of larger checks from the family's account totaling approximately $220,000. These checks were returned unpaid, owing to insufficient funds in the family's account.   During this same time frame, the defendant also wrote large checks from his mother-in-law's account payable to B.E., on which checks he forged his wife's signature. The checks totaled approximately $120,000 and were also returned unpaid as non-sufficient funds checks.

**Evidence Re: Count 8 (Wire Fraud)**.

S.     One of the investors in the scheme described above was an accountant who lived and worked in Michigan and is identified in the Second Superseding Indictment as C.A.   On or about April 22, 2010, C.A. sent the defendant approximately $20,000 to invest in the Dresdner Rocket and Bullet investment program. Both prior to sending this money and thereafter, C.A. had several conversations with the defendant about the investment. In these conversations and in conversations with others, C.A. was led to believe that she would realize a return of approximately $100,000 on her initial investment, which could then be rolled over into another program, ultimately resulting in a $1 million return.   On or about December 13, 2010, the defendant and C.A. exchanged a series of emails concerning the status of her investment and when she could expect her initial return.   In his email to the defendant, alleged in Count 8 of the Second Superseding Indictment, the defendant indicated that he had set up a wire transfer of funds to C.A. but explained that "with this sort of amount it is not an instant process." The emails were

27

exchanged between C.A. in Michigan and the defendant in Colorado.   C.A. never saw the promised wire transfer and ultimately lost her entire principal investment.

**Evidence Re: Count 41 (Monetary Transaction in Criminally Derived Proceeds)**.

T.   As indicated above, the defendant used some of the funds he received from investors to make payments to and purchase gifts for the professional escorts he met in Las Vegas, Nevada.   One of these gifts, as discussed, was a 2011 Land Rover sports utility vehicle.   On or about November 16, 2010, as payment for this vehicle, the defendant caused a wire transfer of $79,491 to be sent from his WGC Group bank account at JP Chase Morgan Bank for the benefit of Hendrick Automotive, the North Carolina car dealership where the defendant had purchased the vehicle.   The funds that were wire transferred by the defendant all originated with Dresdner investor entry fees that the defendant had received as part of the fraudulent scheme.

**The Government's Financial Analysis and Loss Calculations.**

U.   The government analyzed the defendant's bank accounts and other records, together with bank accounts and records of various Dresdner affiliates and investors, to determine the amount of funds obtained by the defendant and co-defendant Beebe and the resultant losses to the Dresdner investors.   The government's calculations, based on this analysis, are as follows:

U.1.   Approximately $5,845,768 was taken in from Dresdner investors on the Rocket and Bullet and .44 Magnum investment programs, or similar Dresdner investment programs, between February 2010 and February 2011.

U.2.   These funds came from a combination of 72 individual investors or groups of investors.   As discussed above, three of these investors or investor groups received payments back to them in excess of their principal investments.   Eight investors or investor groups received refunds of their entire principal investments.   The remaining 61 investors or investor groups

suffered total or partial loss of their principal investments. Collectively, the net loss to these net losing investors was approximately $5,124,795.[13]

U.3.    The defendant's mother-in-law suffered an actual loss of approximately $81,000 as a result of the defendant's related, post-scheme conduct.

## VI.    ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. §3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

**Advisory Guideline Computation.**

### Count 8 (Wire Fraud).

A.    The base guideline is U.S.S.G. §2B1.1, with a base offense level of **7**, pursuant to 2B1.1(a)(1),  because of the wire fraud offense of conviction has a statutory maximum term of imprisonment of 20 years.

B.    Specific Offense Characteristic 2B1.1(b)(1)(J) applies because the applicable loss is greater than $2,500,000 but not more than $7 million, increasing the Offense Level by **18** Levels.

C.    Specific Offense Characteristic 2B1.1(b)(2)(B) applies because the offense

---

[13]    This amount takes into account the $83,000 in post-scheme payments made to B.E. and his investor group by the defendant.

conduct involved more than 50, but not more than 250, victims, increasing the Offense Level by **4** Levels.

D.      The government currently takes no position as to whether the defendant's offense conduct involved sophisticated means, within the meaning of Specific Offense Characteristic 2B1.1(b)(10)(C), warranting an additional 2 Level increase in the defendant's Offense Level score, pursuant to this provision.  However, the government reserves the right to argue that this provision applies at sentencing. The defendant's position is that this Specific Offense Characteristic does not apply.

E.1.    The government's position is that the defendant's Offense Level score should be increased **3 additional levels**, pursuant to U.S.S.G. § 3B1.1(b), because the defendant acted as a manager or supervisor in criminal activity that involved five or more participants or was otherwise extensive.

E.2.    The defendant's position is that this adjustment does not apply and he did not have an aggravating role in the offense conduct.

F.      The parties believe that there are no other victim-related, role-in-offense, obstruction adjustments which apply with respect to the offense conduct associated with this count of conviction. U.S.S.G. Parts 3A-3C.

G.      The Total Offense Level for the wire fraud offense of conviction would accordingly be Level **32**, assuming no offense level adjustment for sophisticated means, based on the government's sentencing guideline positions.  The Total Offense Level would be Level 29 based on the defendant's sentencing guideline positions.

### Count 2 (Engaging in Monetary Transactions).

H.      Pursuant to U.S.S.G. Section 2S1.1(a)(1), the base offense level for the 18 U.S.C.

§1957 offense of conviction corresponds with the offense level for the wire fraud offense of conviction (excluding consideration of Chapter Three Adjustments pertaining to the wire fraud offense conduct) because the defendant committed the underlying offense and the offense level for that offense can be determined.   Based on their respective current guideline positions, the parties agree that, assuming no offense level adjustment for sophisticated means, the base offense Level for the §1957 offense of conviction would therefore be Level **29**.

I.       Specific Offense Characteristic 2S1.1(b)(2)(A) applies because the defendant's money laundering offense is under 18 U.S.C. §1957, increasing the Offense Level by **1 Level**. The Total Offense Level for the 18 U.S.C. §1957 offense of conviction would therefore be Level **30**.

J.       There are no victim-related, role-in-offense, obstruction adjustments related to this offense of conviction which apply in this case. U.S.S.G. Parts 3A-3C.

K.       The Total Offense Level for the 18 U.S.C. §1957 offense of conviction would therefore be Level **30**.

**Grouping of Multiple Counts**.

L.1.     Count 8, the wire fraud offense of conviction, and Count 41, the §1957 offense of conviction, should be grouped, pursuant to U.S.S.G. §3D1.2, because the wire fraud offense in Count 1 is the underlying offense of the §1957 offense.  *See* U.S.S.G. §2S1.1, comment. (n. 6). The offense level for this single group would be the higher of the offense levels determined for the offense of conviction counts.

L.2.     Based on the government's foregoing guideline calculations, the applicable total offense level would accordingly be **Level 32**, because the Total Offense Level for the wire fraud count of conviction is higher than the Total Offense Level for the 18 U.S.C. §1957 offense of

conviction under its guideline analysis.

L.3.    Based on the defendant's foregoing guideline calculations, the applicable total offense level would accordingly be Level 30, because the Total Offense Level for the 18 U.S.C. §1957 offense of conviction is greater than the Total Offense Level for the wire fraud count of conviction under his guideline analysis.

**Final Total Offense Level.**

M.    The defendant is eligible to   receive a **3-level** offense level reduction for acceptance of responsibility, pursuant to U.S.S.G. §3E1.1 based on his timely notification of his intention to resolve this case by guilty plea.   The resulting offense level, based on the government's current calculations, would therefore be **Level 29**, assuming no adjustment owing to sophisticated means to the Total Offense Level for the wire fraud count of conviction.[14]   The resulting offense level, based on the defendant's calculations, would be Level 27.

**Criminal History.**

N.    The parties understand that the defendant's criminal history computation is tentative.   The criminal history category is determined by the Court.   Facts currently known to the parties regarding the criminal history indicate that the defendant has no prior convictions or sentences which would be considered within the applicable period for calculating a criminal history category. Based on the parties' current information, if no other information were discovered, the defendant's criminal history category would be **Category I**.

---

[14]    Should the Court credit all of the government's current sentencing guideline positions and further determine that there should be a two level upward adjustment to the Total Offense Level score for sophisticated means on the wire fraud offense of conviction, then the Final Total Offense Level would be Level 31.

O.     Assuming the (tentative) criminal history facts of (N) above, the career offender/criminal livelihood/armed career criminal adjustments would not apply.

**Resulting Guideline Range**.

P.     The guideline range resulting from the estimated offense level of (M) above, and the (tentative) criminal history category of (N) above, based on the government's current calculations, is **87-108** months. Based on the defendant's calculations, the resulting guideline range is 70-87 months.   However, in order to be as accurate as possible, with the criminal history category undetermined at this time, an estimated offense level 29 (the government's current position) above could conceivably result in a range from 87 months (bottom of Category I), to 188 months (top of Category VI).[15]

**Additional Matters**.

Q.     Pursuant to guideline §5E1.2, assuming the government's estimated offense level of (M) above, the fine range for the offenses of conviction would be $15,000 to $150,000, plus applicable interest and penalties.   Using the defendant's estimated offense level, the fine range for these offenses would be $12,500 to $125,000, plus applicable interest and penalties

R.     Pursuant to guideline §5D1.2, if the Court imposes the term of supervised release, that term shall be at least three years but not more than five years.

S.     Restitution is mandatory in this case under   U.S.S.G. §5E1.1(a)(1).

**3553 Advisement**.

The parties understand that although the Court will consider the parties' estimate, the Court

---

[15]     Should there be a two level sophisticated means upward adjustment to the government calculated Total Offense Level score for the wire fraud offense of conviction, and the Final Total Offense Level accordingly be determined to be Level 31, then the resulting range could conceivably be from 108 months (bottom of Category I), to 235 months (top of Category VI).

33

must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

Except as otherwise provided for by the parties in their plea agreement (Part I herein), no estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, except as otherwise provided for by the parties in their plea agreement (Part I herein), no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. §3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. §3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. §3553 factor.

## VII.   ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or

implied. In entering this agreement, neither the government nor the defendant has relied, or is

relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date:   5-5-2015

_____
Geoffrey H. Lunn
Defendant

Date:   5/5/15

_____
Scott T. Varholak
Assistant Federal Public Defender
Attorney for Defendant Lunn

Date:   5/13/15

_____
Edward R. Harris
Assistant Federal Public Defender
Attorney for Defendant Lunn

Date:   5/14/2015

_____
Kenneth M. Harmon
Assistant U.S. Attorney

35